Justice Stevens
delivered the opinion of the Court.
A well-documented rise in global temperatures has coincided with a significant increase in the concentration of car *505 bon dioxide in the atmosphere. Respected scientists believe the two trends are related. For when carbon dioxide is released into the atmosphere, it acts like the ceiling of a greenhouse, trapping solar energy and retarding the escape of reflected heat. It is therefore a species — the most important species — of a “greenhouse gas.”
Calling global warming “the most pressing environmental challenge of our time,”[1] a group of States,[2] local governments,[3] and private organizations[4] alleged in a petition for certiorari that the Environmental Protection Agency (EPA) has abdicated its responsibility under the Clean Air Act to regulate the emissions of four greenhouse gases, including carbon dioxide. Specifically, petitioners asked us to answer two questions concerning the meaning of § 202(a)(1) of the Act: whether EPA has the statutory authority to regulate greenhouse gas emissions from new motor vehicles; and if so, whether its stated reasons for refusing to do so are consistent with the statute.
In response, EPA, supported by . 10 intervening States[5] and six trade associations,[6] correctly argued that we may not address those two questions unless at least one petitioner has standing to invoke our jurisdiction under Article III of the Constitution. Notwithstanding the serious character of *506 that jurisdictional argument and the absence of any conflicting decisions construing § 202(a)(1), the unusual importance of the underlying issue persuaded us to grant the writ. 548 U. S. 903 (2006).
I
Section 202(a)(1) of the Clean Air Act, as added by Pub. L. 89-272, § 101(8), 79 Stat. 992, and as amended by, inter alia, 84 Stat. 1690 and 91 Stat. 791, 42 U.S.C. § 7521(a)(1), provides:
“The [EPA] Administrator shall by regulation prescribe (and from time to time revise) in accordance with the provisions of this section, standards applicable to the emission of any air pollutant from any class or classes of new motor vehicles or new motor vehicle engines, which in his judgment cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare .. . .”[7]
The Act defines “air pollutant” to include “any air pollution agent or combination of such agents, including any physical, chemical, biological, radioactive . . . substance or matter which is emitted into or otherwise enters the ambient air.” § 7602(g). “Welfare” is also defined broadly: among other things, it includes “effects on . . . weather . . . and climate.” § 7602(h).
*507 When Congress enacted these provisions, the study of climate change was in its infancy.[8] In 1959, shortly after the U. S. Weather Bureau began monitoring atmospheric carbon dioxide levels, an observatory in Mauna Loa, Hawaii, recorded a mean level of 316 parts per million. This was well above the highest carbon dioxide concentration — no more than 300 parts per million — revealed in the 420,000-year-old ice-core record.[9] By the time Congress drafted § 202(a)(1) in 1970, carbon dioxide levels had reached 325 parts per million.[10]
In the late 1970’s, the Federal Government began devoting serious attention to the possibility that carbon dioxide emissions associated with human activity could provoke climate change. In 1978, Congress enacted the National Climate Program Act, 92 Stat. 601, which required the President to establish a program to “assist the Nation and the world to *508 understand and respond to natural and man-induced climate processes and their implications,” id., § 3. . President Carter, in turn, asked the National Research Council, the working arm of the National Academy of Sciences, to investigate the subject. The Council’s response was unequivocal: “If carbon dioxide continues to increase, the study group finds no reason to doubt that climate changes will result and no reason to believe that these changes will be negligible. ... A wait- and-see policy may mean waiting until it is too late.”[11]
Congress next addressed the issue in 1987, when it enacted the Global Climate Protection Act, Title XI of Pub. L. 100-204, 101 Stat. 1407, note following 15 U. S. C. § 2901. Finding that “manmade pollution — the release of carbon dioxide, chlorofluoroearbons, methane, and other trace gases into the atmosphere — may be producing a long-term and substantial increase in the average temperature on Earth,” §1102(1), 101 Stat. 1408, Congress directed EPA to propose to Congress a “coordinated national policy on global climate change,” § 1103(b), and ordered the Secretary of State to work “through the channels of multilateral diplomacy” and coordinate diplomatic efforts to combat global warming, § 1103(c). Congress emphasized that “ongoing pollution and deforestation may be contributing now to an irreversible process” and that “[njecessary actions must be identified and implemented in time to protect the climate.” § 1102(4).
Meanwhile, the scientific understanding of climate change progressed. In 1990, the Intergovernmental Panel on Climate Change (IPCC), a multinational scientific body organized under the auspices of the United Nations, published its first comprehensive report on the topic. Drawing on expert opinions from across the globe, the IPCC concluded that “emissions resulting from human activities are substantially *509 increasing the atmospheric concentrations of . . . greenhouse gases [which] will enhance the greenhouse effect, resulting on average in an additional warming of the Earth’s surface.”[12]
Responding to the IPCC report, the United Nations convened the “Earth Summit” in 1992 in Rio de Janeiro. The first President Bush attended and signed the United Nations Framework Convention on Climate Change (UNFCCC), a nonbinding agreement among 154 nations to reduce atmospheric concentrations of carbon dioxide and other greenhouse gases for the purpose of “preventing] dangerous anthropogenic [i. e., human-induced] interference with the [Earth’s] climate system.”[13] S. Treaty Doc. No. 102-38, Art. 2, p. 5,1771 U. N. T. S. 107 (1992). The Senate unanimously ratified the treaty.
Some five years later — after the IPCC issued a second comprehensive report in 1995 concluding that “[t]he balance of evidence suggests there is a discernible human influence on global climate”[14] — the UNFCCC signatories met in Kyoto, Japan, and adopted a protocol that assigned mandatory targets for industrialized nations to reduce greenhouse gas emissions. Because those targets did not apply to developing and heavily polluting nations such as China and India, the Senate unanimously passed a resolution expressing its sense that the United States should not enter into the Kyoto Protocol. See S. Res. 98, 105th Cong., 1st Sess. (July 25, 1997) (as passed). President Clinton did not submit the protocol to the Senate for ratification.
*510 II
On October 20, 1999, a group of 19 private organizations[15] filed a rulemaking petition asking EPA to regulate “greenhouse gas emissions from new motor vehicles under § 202 of the Clean Air Act.” App. 5. Petitioners maintained that 1998 was the “warmest year on record”; that carbon dioxide, methane, nitrous oxide, and hydrofluorocarbons are “heat trapping greenhouse gases”; that greenhouse gas emissions have significantly accelerated climate change; and that the IPCC’s 1995 report warned that “carbon dioxide remains the most important contributor to [manmade] forcing of climate change.” Id., at 13 (internal quotation marks omitted). The petition further alleged that climate change will have serious adverse effects on human health and the environment. Id., at 22-35. As to EPA’s statutory authority, the petition observed that the Agency itself had already confirmed that it had the power to regulate carbon dioxide. See id., at 18, n. 21. In 1998, Jonathan Z. Cannon, then EPA’s general counsel, prepared a legal opinion concluding that “C02 emissions are within the scope of EPA’s authority to regulate,” even as he recognized that EPA had so far declined to exercise that authority. Id., at 54 (memorandum to Carol M. Browner, Administrator (Apr. 10,1998) (hereinafter Cannon memorandum)). Cannon’s successor, Gary S. Guzy, reiterated that opinion before a congressional committee just *511 two weeks before the rulemaking petition was filed. See id., at 61.
Fifteen months after the petition's submission, EPA requested public comment on “all the issues raised in [the] petition,” adding a “particular” request for comments on “any scientific, technical, legal, economic or other aspect of these issues that may be relevant to EPA’s consideration of this petition.” 66 Fed. Reg. 7486, 7487 (2001). EPA received more than 50,000 comments over the next five months. See 68 Fed. Reg. 52924 (2003).
Before the close of the comment period, the White House sought “assistance in identifying the areas in the science of climate change where there are the greatest certainties and uncertainties” from the National Research Council, asking for a response “as soon as possible.” App. 213. The result was a 2001 report titled Climate Change Science: An Analysis of Some Key Questions (NRC Report), which, drawing heavily on the 1995 IPCC report, concluded that “[greenhouse gases are accumulating in Earth’s atmosphere as a result of human activities, causing surface air temperatures and subsurface ocean temperatures to rise. Temperatures are, in fact, rising.” NRC Report 1.
On September 8, 2003, EPA entered an order denying the rulemaking petition. 68 Fed. Reg. 52922. The Agency gave two reasons for its decision: (1) that contrary to the opinions of its former general counsels, the Clean Air Act does not authorize EPA to issue mandatory regulations to address global climate change, see id., at 52925-52929; and (2) that even if the Agency had the authority to set greenhouse gas emission standards, it would be unwise to do so at this time, id., at 52929-52931.
In concluding that it lacked statutory authority over greenhouse gases, EPA observed that Congress “was well aware of the global climate change issue when it last comprehensively amended the [Clean Air Act] in 1990,” yet it declined to adopt a proposed amendment establishing binding *512 emissions limitations. Id., at 52926. Congress instead chose to authorize further investigation into climate change. Ibid, (citing §§ 103(g) and 602(e) of the Clean Air Act Amendments of 1990, 104 Stat. 2652, 2703, 42 U. S. C. §§ 7403(g)(1) and 7671a(e)). EPA further reasoned that Congress’ “specially tailored solutions to global atmospheric issues,” 68 Fed. Reg. 52926 — in particular, its 1990 enactment of a comprehensive scheme to regulate pollutants that depleted the ozone layer, see Title VI, 104 Stat. 2649, 42 U. S. C. §§7671-7671q — counseled against reading the general authorization of § 202(a)(1) to confer regulatory authority over greenhouse gases.
EPA stated that it was “urged on in this view,” 68 Fed. Reg. 52928, by this Court’s decision in FDA v. Brown & Williamson Tobacco Corp., 529 U. S. 120 (2000). In that case, relying on “tobacco[’s] unique political history,” id., at 159, we invalidated the Food and Drug Administration’s reliance on its general authority to regulate drugs as a basis for asserting jurisdiction over an “industry constituting a significant portion of the American economy,” ibid.
EPA reasoned that climate change had its own “political history”: Congress designed the original Clean Air Act to address local air pollutants rather than a substance that “is fairly consistent in its concentration throughout the world’s atmosphere,” 68 Fed. Reg. 52927; declined in 1990 to enact proposed amendments to force EPA to set carbon dioxide emission standards for motor vehicles, ibid, (citing H. R. 5966, 101st Cong., 2d Sess. (1990)); and addressed global climate change in other legislation, 68 Fed. Reg. 52927. Because of this political history, and because imposing emission limitations on greenhouse gases would have even greater economic and political repercussions than regulating tobacco, EPA was persuaded that it lacked the power to do so. Id., at 52928. In essence, EPA concluded that climate change was so important that unless Congress spoke with exacting specificity, it could not have meant the Agency to address it.
*513 Having reached that conclusion, EPA believed it followed that greenhouse gases cannot be “air pollutants” within the meaning of the Act. See ibid. (“It follows from this conclusion, that [greenhouse gases], as such, are not air pollutants under the [Clean Air Act’s] regulatory provisions . . . ”). The Agency bolstered this conclusion by explaining that if carbon dioxide were an air pollutant, the only feasible method of reducing tailpipe emissions would be to improve fuel economy. But because Congress has already created detailed mandatory fuel economy standards subject to Department of Transportation (DOT) administration, the Agency concluded that EPA regulation would either conflict with those standards or be superfluous. Id., at 52929.
Even assuming that it had authority over greenhouse gases, EPA explained in detail why it would refuse to exercise that authority. The Agency began by recognizing that the concentration of greenhouse gases has dramatically increased as a result of human activities, and acknowledged the attendant increase in global surface air temperatures. Id., at 52930. EPA nevertheless gave controlling importance to the NRC Report’s statement that a causal link between the two “‘cannot be unequivocally established.’” Ibid, (quoting NRC Report 17). Given that residual uncertainty, EPA concluded that regulating greenhouse gas emissions would be unwise. 68 Fed. Reg. 52930.
The Agency furthermore characterized any EPA regulation of motor-vehicle emissions as a “piecemeal approach” to climate change, id., at 52931, and stated that such regulation would conflict with the President’s “comprehensive approach” to the problem, ibid. That approach involves additional support for technological innovation, the creation of nonregulatory programs to encourage voluntary private-sector reductions in greenhouse gas emissions, and further research on climate change — not actual regulation. Id., at 52932-52933. According to EPA, unilateral EPA regulation of motor-vehicle greenhouse gas emissions might also *514 hamper the President’s ability to persuade key developing countries to reduce greenhouse gas emissions. Id., at 52931.
III
Petitioners, now joined by intervenor States and local governments, sought review of EPA’s order in the United States Court of Appeals for the District of Columbia Circuit.[16] Although each of the three judges on the panel wrote a separate opinion, two judges agreed “that the EPA Administrator properly exercised his discretion under § 202(a)(1) in denying the petition for rule making.” 415 F. 3d 50, 58 (2005). The court therefore denied the petition for review.
In his opinion announcing the court’s judgment, Judge Randolph avoided a definitive ruling as to petitioners’ standing, id., at 56, reasoning that it was permissible to proceed to the merits because the standing and the merits inquiries “overlapped],” ibid. Assuming without deciding that the statute authorized the EPA Administrator to regulate greenhouse gas emissions that “in his judgment” may “reasonably be anticipated to endanger public health or welfare,” 42 U. S. C. § 7521(a)(1), Judge Randolph concluded that the exercise of that judgment need not be based solely on scientific evidence, but may also be informed by the sort of policy judgments that motivate congressional action. 415 F. 3d, at 58. Given that framework, it was reasonable for EPA to base its decision on scientific uncertainty as well as on other factors, including the concern that unilateral regulation of U. S. motor-vehicle emissions could weaken efforts to reduce greenhouse gas emissions from other countries. Ibid.
Judge Sentelle wrote separately because he believed petitioners failed to “demonstrate] the element of injury neces *515 sary to establish standing under Article III.” Id., at 59 (opinion dissenting in part and concurring in judgment). In his view, they had alleged that global warming is “harmful to humanity at large,” but could not allege “particularized injuries” to themselves. Id., at 60 (citing Lujan v. Defenders of Wildlife, 504 U. S. 555, 562 (1992)). While he dissented on standing, however, he accepted the contrary view as the law of the case and joined Judge Randolph’s judgment on the merits as the closest to that which he preferred. 415 F. 3d, at 60-61.
Judge Tatel dissented. Emphasizing that EPA nowhere challenged the factual basis of petitioners’ affidavits, id., at 66, he concluded that at least Massachusetts had “satisfied each element of Article III standing — injury, causation, and redressability,” id., at 64. In Judge Tatel’s view, the “‘substantial probability,’” id., at 66, that projected rises in sea level would lead to serious loss of coastal property was a “far cry” from the kind of generalized harm insufficient to ground Article III jurisdiction. Id., at 65. He found that petitioners’ affidavits more than adequately supported the conclusion that EPA’s failure to curb greenhouse gas emissions contributed to the sea level changes that threatened Massachusetts’ coastal property. Ibid. As to redressability, he observed that one of petitioners’ experts, a former EPA climatologist, stated that “ ‘[achievable reductions in emissions of C02 and other [greenhouse gases] from U. S. motor vehicles would... delay and moderate many of the adverse impacts of global warming.’” Ibid, (quoting declaration of Michael MacCracken, former Executive Director, U. S. Global Change Research Program ¶50 (hereinafter MacCracken Deck), available in 2 Petitioners’ Standing Appendix in No. 03-1361 etc. (CADC), p. 209 (Stdg. App.)). He further noted that the one-time director of EPA’s motor-vehicle pollution control efforts stated in an affidavit that enforceable emission standards would lead to the development of new technologies that “‘would gradually be mandated by other countries around *516 the world.’ ” 415 F. 3d, at 66 (quoting declaration of Michael Walsh ¶¶ 7-8, 10, Stdg. App. 309-310, 311). On the merits, Judge Tatel explained at length why he believed the text of the statute provided EPA with authority to regulate greenhouse gas emissions, and why its policy concerns did not justify its refusal to exercise that authority. 415 F. 3d, at 67-82.
IV
Article III of the Constitution limits federal-court jurisdiction to “Cases” and “Controversies.” Those two words confine “the business of federal courts to questions presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process.” Flast v. Cohen, 392 U. S. 83, 95 (1968). It is therefore familiar learning that no justiciable “controversy” exists when parties seek adjudication of a political question, Luther v. Borden, 7 How. 1 (1849), when they ask for an advisory opinion, Hayburn’s Case, 2 Dall. 409 (1792), see also Clinton v. Jones, 520 U. S. 681,700, n. 33 (1997), or when the question sought to be adjudicated has been mooted by subsequent developments, California v. San Pablo & Tulare R. Co., 149 U. S. 308 (1893). This case suffers from none of these defects.
The parties’ dispute turns on the proper construction of a congressional statute, a question eminently suitable to resolution in federal court. Congress has moreover authorized this type of challenge to EPA action. See 42 U. S. C. § 7607(b)(1). That authorization is of critical importance to the standing inquiry: “Congress has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before.” Lujan, 504 U. S., at 580 (Kennedy, J., concurring in part and concurring in judgment). “In exercising this power, however, Congress must at the very least identify the injury it seeks to vindicate and relate the injury to the class of persons entitled to bring suit.” Ibid. We will not, therefore, “entertain citi *517 zen suits to vindicate the public’s nonconcrete interest in the proper administration of the laws.” Id., at 581.
EPA maintains that because greenhouse gas emissions inflict widespread harm, the doctrine of standing presents an insuperable jurisdictional obstacle. We do not agree. At bottom, “the gist of the question of standing” is whether petitioners have “such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination.” Baker v. Carr, 369 U. S. 186, 204 (1962). As Justice Kennedy explained in his Lujan concurrence:
“While it does not matter how many persons have been injured by the challenged action, the party bringing suit must show that the action injures him in a concrete and personal way. This requirement is not just an empty formality. It preserves the vitality of the adversarial process by assuring both that the parties before the court have an actual, as opposed to professed, stake in the outcome, and that the legal questions presented ... will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action.” 504 U. S., at 581 (internal quotation marks omitted).
To ensure the proper adversarial presentation, Lujan holds that a litigant must demonstrate that it has suffered a concrete and particularized injury that is either actual or imminent, that the injury is fairly traceable to the defendant, and that it is likely that a favorable decision will redress that injury. See id., at 560-561. However, a litigant to whom Congress has “accorded a procedural right to protect his concrete interests,” id., at 572, n. 7 — here, the right to challenge agency action unlawfully withheld, § 7607(b)(1) — “can assert that right without meeting all the normal standards for re *518 dressability and immediacy,” ibid. When a litigant is vested with a procedural right, that litigant has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant. Ibid.; see also Sugar Cane Growers Cooperative of Fla. v. Veneman, 289 F. 3d 89, 94-95 (CADC 2002) (“A [litigant] who alleges a deprivation of a procedural protection to which he is entitled never has to prove that if he had received the procedure the substantive result would have been altered. All that is necessary is to show that the procedural step was connected to the substantive result”).
Only one of the petitioners needs to have standing to permit us to consider the petition for review. See Rumsfeld v. Forum for Academic and Institutional Rights, Inc., 547 U. S. 47, 52, n. 2 (2006). We stress here, as did Judge Tatel below, the special position and interest of Massachusetts. It is of considerable relevance that the party seeking review here is a sovereign State and not, as it was in Lujan, a private individual.
Well before the creation of the modern administrative state, we recognized that States are not normal litigants for the purposes of invoking federal jurisdiction. As Justice Holmes explained in Georgia v. Tennessee Copper Co., 206 U. S. 230, 237 (1907), a case in which Georgia sought to protect its citizens from air pollution originating outside its borders:
“The case has been argued largely as if it were one between two private parties; but it is not. The very elements that would be relied upon in a suit between fellow-citizens as a ground for equitable relief are wanting here. The State owns very little of the territory alleged to be affected, and the damage to it capable of estimate in money, possibly, at least, is small. This is a suit by a State for an injury to it in its capacity of gwcm-sovereign. In that capacity the State has an interest independent of and behind the titles of its citizens, *519 in all the earth and air within its domain. It has the last word as to whether its mountains shall be stripped of their forests and its inhabitants shall breathe pure air.”
Just as Georgia’s independent interest “in all the earth and air within its domain” supported federal jurisdiction a century ago, so too does Massachusetts’ well-founded desire to preserve its sovereign territory today. Cf. Alden v. Maine, 527 U. S. 706, 715 (1999) (observing that in the federal system, the States “are not relegated to the role of mere provinces or political corporations, but retain the dignity, though not the full authority, of sovereignty”). That Massachusetts does in fact own a great deal of the “territory alleged to be affected” only reinforces the conclusion that its stake in the outcome of this case is sufficiently concrete to warrant the exercise of federal judicial power.
When a State enters the Union, it surrenders certain sovereign prerogatives. Massachusetts cannot invade Rhode Island to force reductions in greenhouse gas emissions, it cannot negotiate an emissions treaty with China or India, and in some circumstances the exercise of its police powers to reduce in-state motor-vehicle emissions might well be pre-empted. See Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez, 458 U. S. 592, 607 (1982) (“One helpful indication in determining whether an alleged injury to the health and welfare of its citizens suffices to give the State standing to sue parens patriae is whether the injury is one that the State, if it could, would likely attempt to address through its sovereign lawmaking powers”).
These sovereign prerogatives are now lodged in the Federal Government, and Congress has ordered EPA to protect Massachusetts (among others) by prescribing standards applicable to the “emission of any air pollutant from any class or classes of new motor vehicle engines, which in [the Administrator’s] judgment cause, or contribute to, air pollution which may reasonably be anticipated to endanger public *520 health or welfare.” 42 U. S. C. § 7521(a)(1). Congress has moreover recognized a concomitant procedural right to challenge the rejection of its rulemaking petition as arbitrary and capricious. § 7607(b)(1). Given that procedural right and Massachusetts’ stake in protecting its quasi-sovereign interests, the Commonwealth is entitled to special solicitude in our standing analysis.[17]
*521 With that in mind, it is clear that petitioners’ submissions as they pertain to Massachusetts have satisfied the most demanding standards of the adversarial process. EPA’s steadfast refusal to regulate greenhouse gas emissions presents a risk of harm to Massachusetts that is both “actual” and “imminent.” Lujan, 504 U. S., at 560 (internal quotation marks omitted). There is, moreover, a “substantial likelihood that the judicial relief requested” will prompt EPA to take steps to reduce that risk. Duke Power Co. v. Carolina Environmental Study Group, Inc., 438 U. S. 59, 79 (1978).

The Injury

The harms associated with climate change are serious and well recognized. Indeed, the NRC Report itself — which EPA regards as an “objective and independent assessment of the relevant science,” 68 Fed. Reg. 52930 — identifies a number of environmental changes that have already inflicted significant harms, including “the global retreat of mountain glaciers, reduction in snow-cover extent, the earlier spring melting of ice on rivers and lakes, [and] the accelerated rate of rise of sea levels during the 20th century relative to the past few thousand years . . . .” NRC Report 16.
Petitioners allege that this only hints at the environmental damage yet to come. According to the climate scientist Michael MacCracken, “qualified scientific experts involved in climate change research” have reached a “strong consensus” that global warming threatens (among other things) a precipitate rise in sea levels by the end of the century, MacCraeken Decl. ¶ 5, Stdg. App. 207, “severe and irreversible changes to natural ecosystems,” id., ¶ 5(d), at 209, a “significant reduction in water storage in winter snowpack in mountainous regions with direct and important economic consequences,” ibid., and an increase in the spread of disease, id., ¶ 28, at 218-219. He also observes that rising ocean temper *522 atures may contribute to the ferocity of hurricanes. Id., ¶¶ 23-25, at 216-217.[18]
That these climate-change risks are “widely shared” does not minimize Massachusetts’ interest in the outcome of this litigation. See Federal Election Comm’n v. Akins, 524 U. S. 11, 24 (1998) (“[W]here a harm is concrete, though widely shared, the Court has found ‘injury in fact’”). According to petitioners’ unchallenged affidavits, global sea levels rose somewhere between 10 and 20 centimeters over the 20th century as a result of global warming. MacCracken Decl. ¶ 5(c), Stdg. App. 208. These rising seas have already begun to swallow Massachusetts’ coastal land. Id., at 196 (declaration of Paul H. Kirshen ¶ 5), 216 (MacCracken Deck ¶23). Because the Commonwealth “owns a substantial portion of the state’s coastal property,” id., at 171 (declaration of Karst R. Hoogeboom ¶ 4),[19] it has alleged a particularized injury in its capacity as a landowner. The severity of that injury will *523 only increase over the course of the next century: If sea levels continue to rise as predicted, one Massachusetts official believes that a significant fraction of coastal property will be “either permanently lost through inundation or temporarily lost through periodic storm surge and flooding events.” Id., ¶6, at 172.[20] Remediation costs alone, petitioners allege, could run well into the hundreds of millions of dollars. Id., ¶ 7, at 172; see also Kirshen Decl. ¶ 12, at 198.[21]

Causation

EPA does not dispute the existence of a causal connection between manmade greenhouse gas emissions and global warming. At a minimum, therefore, EPA’s refusal to regulate such emissions “contributes” to Massachusetts’ injuries.
EPA nevertheless maintains that its decision not to regulate greenhouse gas emissions from new motor vehicles contributes so insignificantly to petitioners’ injuries that the Agency cannot be haled into federal court to answer for them. For the same reason, EPA does not believe that any realistic possibility exists that the relief petitioners seek would mitigate global climate change and remedy their injuries. That is especially so because predicted increases in greenhouse *524 gas emissions from developing nations, particularly China and India, are likely to offset any marginal domestic decrease.
But EPA overstates its case. Its argument rests on the erroneous assumption that a small incremental step, because it is incremental, can never be attacked in a federal judicial forum. Yet accepting that premise would doom most challenges to regulatory action. Agencies, like legislatures, do not generally resolve massive problems in one fell regulatory swoop. See Williamson v. Lee Optical of Okla., Inc., 348 U. S. 483, 489 (1955) (“[A] reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind”)- They instead whittle away at them over time, refining their preferred approach as circumstances change and as they develop a more nuanced understanding of how best to proceed. Cf. SEC v. Chenery Corp., 332 U. S. 194, 202 (1947) (“Some principles must await their own development, while others must be adjusted to meet particular, unforeseeable situations”). That a first step might be tentative does not by itself support the notion that federal courts lack jurisdiction to determine whether that step conforms to law.
And reducing domestic automobile emissions is hardly a tentative step. Even leaving aside the other greenhouse gases, the United States transportation sector emits an enormous quantity of carbon dioxide into the atmosphere — according to the MacCracken affidavit, more than 1.7 billion metric tons in 1999 alone. ¶ 30, Stdg. App. 219. That accounts for more than 6% of worldwide carbon dioxide emissions. Id., at 232 (Oppenheimer Decl. ¶3); see also MacCracken Decl. ¶31, at 220. To put this in perspective: Considering just emissions from the transportation sector, which represent less than one-third of this country's total carbon dioxide emissions, the United States would still rank as the third-largest emitter of carbon dioxide in the world, *525 outpaced only by the European Union and China.[22] Judged by any standard, U. S. motor-vehicle emissions make a meaningful contribution to greenhouse gas concentrations and hence, according to petitioners, to global warming.

The Remedy

While it may be true that regulating motor-vehicle emissions will not by itself reverse global warming, it by no means follows that we lack jurisdiction to decide whether EPA has a duty to take steps to slow or reduce it. See also Larson v. Valente, 456 U. S. 228, 244, n. 15 (1982) ("[A] plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his every injury”). Because of the enormity of the potential consequences associated with manmade climate change, the fact that the effectiveness of a remedy might be delayed during the (relatively short) time it takes for a new motor-vehicle fleet to replace an older one is essentially irrelevant.[23] Nor is it dispositive that developing countries such as China and India are poised to increase greenhouse gas emissions *526 substantially over the next century: A reduction in domestic emissions would slow the pace of global emissions increases, no matter what happens elsewhere.
We moreover attach considerable significance to EPA’s “agree[ment] with the President that ‘we must address the issue of global climate change,’ ” 68 Fed. Reg. 52929 (quoting remarks announcing Clear Skies and Global Climate Initiatives, 2002 Public Papers of George W. Bush, Vol. 1, Feb. 14, p. 227 (2004)), and to EPA’s ardent support for various voluntary emission-reduction programs, 68 Fed. Reg. 52932. As Judge Tatel observed in dissent below, “EPA would presumably not bother with such efforts if it thought emissions reductions would have no discernable impact on future global warming.” 415 F. 3d, at 66.
In sum — at least according to petitioners’ uncontested affidavits — the rise in sea levels associated with global warming has already harmed and will continue to harm Massachusetts. The risk of catastrophic harm, though remote, is nevertheless real. That risk would be reduced to some extent if petitioners received the relief they seek. We therefore hold that petitioners have standing to challenge EPA’s denial of their rulemaking petition.[24]
*527 V
The scope of our review of the merits of the statutory issues is narrow. As we have repeated time and again, an agency has broad discretion to choose how best to marshal its limited resources and personnel to carry out its delegated responsibilities. See Chevron U. S. A. Inc. v. Natural Resources Defense Council, Inc., 467 U. S. 837, 842-845 (1984). That discretion is at its height when the agency decides not to bring an enforcement action. Therefore, in Heckler v. Chaney, 470 U. S. 821 (1985), we held that an agency’s refusal to initiate enforcement proceedings is not ordinarily subject to judicial review. Some debate remains, however, as to the rigor with which we review an agency’s denial of a petition for rulemaking.
There are key differences between a denial of a petition for rulemaking and an agency’s decision not to initiate an enforcement action. See American Horse Protection Assn., Inc. v. Lyng, 812 F. 2d 1, 3-4 (CADC 1987). In contrast to nonenforeement decisions, agency refusals to initiate rule-making “are less frequent, more apt to involve legal as opposed to factual analysis, and subject to special formalities, including a public explanation.” Id., at 4; see also 5 U. S. C. § 555(e). They moreover arise out of denials of petitions for rulemaking which (at least in the circumstances here) the affected party had an undoubted procedural right to file in the first instance. Refusals to promulgate rules are thus susceptible to judicial review, though such review is “ex *528 tremely limited” and “highly deferential.” National Customs Brokers & Forwarders Assn. of America, Inc. v. United States, 883 F. 2d 93, 96 (CADC 1989).
EPA concluded in its denial of the petition for rulemaking that it lacked authority under 42 U. S. C. § 7521(a)(1) to regulate new vehicle emissions because carbon dioxide is not an “air pollutant” as that term is defined in § 7602. In the alternative, it concluded that even if it possessed authority, it would decline to do so because regulation would conflict with other administration priorities. As discussed earlier, the Clean Air Act expressly permits review of such an action. § 7607(b)(1). We therefore “may reverse any such action found to be . .. arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.” § 7607(d)(9).
VI
On the merits, the first question is whether § 202(a)(1) of the Clean Air Act authorizes EPA to regulate greenhouse gas emissions from new motor vehicles in the event that it forms a “judgment” that such emissions contribute to climate change. We have little trouble concluding that it does. In relevant part, § 202(a)(1) provides that EPA “shall by regulation prescribe ... standards applicable to the emission of any air pollutant from any class or classes of new motor vehicles or new motor vehicle engines, which in [the Administrator’s] judgment cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare.” 42 U. S. C. § 7521(a)(1). Because EPA believes that Congress did not intend it to regulate substances that contribute to climate change, the agency maintains that carbon dioxide is not an “air pollutant” within the meaning of the provision.
The statutory text forecloses EPA’s reading. The Clean Air Act’s sweeping definition of “air pollutant” includes “any air pollution agent or combination of such agents, including any physical, chemical... substance or matter which is emit *529 ted into or otherwise enters the ambient air....” § 7602(g) (emphasis added). On its face, the definition embraces all airborne compounds of whatever stripe, and underscores that intent through the repeated use of the word “any.”[25] Carbon dioxide, methane, nitrous oxide, and hydrofluorocarbons are without a doubt “physical [and] chemical... substance[s] which [are] emitted into . .. the ambient air.” The statute is unambiguous.[26]
Rather than relying on statutory text, EPA invokes post-enactment congressional actions and deliberations it views as tantamount to a congressional command to refrain from regulating greenhouse gas emissions. Even if such post-enactment legislative history could shed light on the meaning of an otherwise-unambiguous statute, EPA never identifies any action remotely suggesting that Congress meant to curtail its power to treat greenhouse gases as air pollutants. That subsequent Congresses have eschewed enacting bind *530 ing emissions limitations to combat global warming tells us nothing about what Congress meant when it amended § 202(a)(1) in 1970 and 1977.[27] And unlike EPA, we have no difficulty reconciling Congress’ various efforts to promote interagency collaboration and research to better understand climate change[28] with the Agency’s pre-existing mandate to regulate “any air pollutant” that may endanger the public welfare. See 42 U. S. C. § 7601(a)(1). Collaboration and research do not conflict with any thoughtful regulatory effort; they complement it.[29]
EPA’s reliance on Brown & Williamson Tobacco Corp., 529 U. S. 120, is similarly misplaced. In holding that tobacco products are not “drugs” or “devices” subject to Food and Drug Administration (FDA) regulation pursuant to the Food, Drug and Cosmetic Act (FDCA), see 529 U. S., at 133, we *531 found critical at least two considerations that have no counterpart in this case.
First, we thought it unlikely that Congress meant to ban tobacco products, which the FDCA would have required had such products been classified as “drugs” or “devices.” Id., at 135-137. Here, in contrast, EPA jurisdiction would lead to no such extreme measures. EPA would only regulate emissions, and even then, it would have to delay any action “to permit the development and application of the requisite technology, giving appropriate consideration to the cost of compliance,” § 7521(a)(2). However much a ban on tobacco products clashed with the “common sense” intuition that Congress never meant to remove those products from circulation, Brown & Williamson, 529 U. S., at 133, there is nothing counterintuitive to the notion that EPA can curtail the emission of substances that are putting the global climate out of kilter.
Second, in Brown & Williamson we pointed to an unbroken series of congressional enactments that made sense only if adopted “against the backdrop of the FDA’s consistent and repeated statements that it lacked authority under the FDCA to regulate tobacco.” Id., at 144. We can point to no such enactments here: EPA has not identified any congressional action that conflicts in any way with the regulation of greenhouse gases from new motor vehicles. Even if it had, Congress could not have acted against a regulatory “backdrop” of disclaimers of regulatory authority. Prior to the order that provoked this litigation, EPA had never disavowed the authority to regulate greenhouse gases, and in 1998 it in fact affirmed that it had such authority. See App. 54 (Cannon memorandum). There is no reason, much less a compelling reason, to accept EPA’s invitation to read ambiguity into a clear statute.
EPA finally argues that it cannot regulate carbon dioxide emissions from motor vehicles because doing so would require it to tighten mileage standards, a job (according to *532 EPA) that Congress has assigned to DOT. See 68 Fed. Reg. 52929. But that DOT sets mileage standards in no way licenses EPA to shirk its environmental responsibilities. EPA has been charged with protecting the public's “health” and “welfare,” 42 U. S. C. § 7521(a)(1), a statutory obligation wholly independent of DOT’S mandate to promote energy efficiency. See Energy Policy and Conservation Act, § 2(5), 89 Stat. 874,42 U. S. C. § 6201(5). The two obligations may overlap, but there is no reason to think the two agencies cannot both administer their obligations and yet avoid inconsistency.
While the Congresses that drafted § 202(a)(1) might not have appreciated the possibility that burning fossil fuels could lead to global warming, they did understand that without regulatory flexibility, changing circumstances and scientific developments would soon render the Clean Air Act obsolete. The broad language of § 202(a)(1) reflects an intentional effort to confer the flexibility necessary to forestall such obsolescence. See Pennsylvania Dept. of Corrections v. Yeskey, 524 U. S. 206, 212 (1998) (“[T]he fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth” (internal quotation marks omitted)). Because greenhouse gases fit well within the Clean Air Act’s capacious definition of “air pollutant,” we hold that EPA has the statutory authority to regulate the emission of such gases from new motor vehicles.
VII
The alternative basis for EPA’s decision — that even if it does have statutory authority to regulate greenhouse gases, it would be unwise to do so at this time — rests on reasoning divorced from the statutory text. While the statute does condition the exercise of EPA’s authority on its formation of a “judgment,” 42 U. S. C. § 7521(a)(1), that judgment must relate to whether an air pollutant “eause[s], or contribute[s] to, air pollution which may reasonably be anticipated to en *533 danger public health or welfare,” ibid. Put another way, the use of the word “judgment” is not a roving license to ignore the statutory text. It is but a direction to exercise discretion within defined statutory limits.
If EPA makes a finding of endangerment, the Clean Air Act requires the Agency to regulate emissions of the deleterious pollutant from new motor vehicles. Ibid, (stating that “[EPA] shall by regulation prescribe... standards applicable to the emission of any air pollutant from any class or classes of new motor vehicles”). EPA no doubt has significant latitude as to the manner, timing, content, and coordination of its regulations with those of other agencies. But once EPA has responded to a petition for rulemaking, its reasons for action or inaction must conform to the authorizing statute. Under the clear terms of the Clean Air Act, EPA can avoid taking further action only if it determines that greenhouse gases do not contribute to climate change or if it provides some reasonable explanation as to why it cannot or will not exercise its discretion to determine whether they do. Ibid. To the extent that this constrains agency discretion to pursue other priorities of the Administrator or the President, this is the congressional design.
EPA has refused to comply with this clear statutory command. Instead, it has offered a laundry list of reasons not to regulate. For example, EPA said that a number of voluntary Executive Branch programs already provide an effective response to the threat of global warming, 68 Fed. Reg. 52932, that regulating greenhouse gases might impair the President’s ability to negotiate with “key developing nations” to reduce emissions, id., at 52931, and that curtailing motor-vehicle emissions would reflect “an inefficient, piecemeal approach to address the climate change issue,” ibid.
Although we have neither the expertise nor the authority to evaluate these policy judgments, it is evident they have nothing to do with whether greenhouse gas emissions contribute to climate change. Still less do they amount to a *534 reasoned justification for declining to form a scientific judgment. In particular, while the President has broad authority in foreign affairs, that authority does not extend to the refusal to execute domestic laws. In the Global Climate Protection Act of 1987, Congress authorized the State Department — not EPA — to formulate United States foreign policy with reference to environmental matters relating to climate. See § 1103(c), 101 Stat. 1409. EPA has made no showing that it issued the ruling in question here after consultation with the State Department. Congress did direct EPA to consult with other agencies in the formulation of its policies and rules, but the State Department is absent from that list. § 1103(b).
Nor can EPA avoid its statutory obligation by noting the uncertainty surrounding various features of climate change and concluding that it would therefore be better not to regulate at this time. See 68 Fed. Reg. 52930-52931. If the scientific uncertainty is so profound that it precludes EPA from making a reasoned judgment as to whether greenhouse gases contribute to global warming, EPA must say so. That EPA would prefer not to regulate greenhouse gases because of some residual uncertainty — which, contrary to Justice Scalia’s apparent belief, post, at 553-555, is in fact all that it said, see 68 Fed. Reg. 52929-52930 (“We do not believe ... that it would be either effective or appropriate for EPA to establish [greenhouse gas] standards for motor vehicles at this time” (emphasis added)) — is irrelevant. The statutory question is whether sufficient information exists to make an endangerment finding.
In short, EPA has offered no reasoned explanation for its refusal to decide whether greenhouse gases cause or contribute to climate change. Its action was therefore “arbitrary, capricious, ... or otherwise not in accordance with law.” 42 U. S. C. § 7607(d)(9)(A). We need not and do not reach the question whether on remand EPA must make an endangerment finding, or whether policy concerns can inform *535 EPA's actions in the event that it makes such a finding. Cf. Chevron U. S. A. Inc. v. Natural Resources Defense Council, Inc., 467 U. S., at 843-844. We hold only that EPA must ground its reasons for action or inaction in the statute.
VIII
The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

It is so ordered.

 Pet. for Cert. 22.

 California, Connecticut, Illinois, Maine, Massachusetts, New Jersey, New Mexico, New York, Oregon, Rhode Island, Vermont, and Washington.

 District of Columbia, American Samoa, New York City, and Baltimore.

 Center for Biological Diversity, Center for Food Safety, Conservation Law Foundation, Environmental Advocates, Environmental Defense, Friends of the Earth, Greenpeace, International Center for Technology Assessment, National Environmental Trust, Natural Resources Defense Council, Sierra Club, Union of Concerned Scientists, and U. S. Public Interest Research Group.

 Alaska, Idaho, Kansas, Michigan, Nebraska, North Dakota, Ohio, South Dakota, Texas, and Utah.

 Alliance of Automobile Manufacturers, National Automobile Dealers Association, Engine Manufacturers Association, Truck Manufacturers Association, C02 Litigation Group, and Utility Air Regulatory Group.

 The 1970 version of § 202(a)(1) used the phrase “which endangers the public health or welfare” rather than the more protective “which may reasonably be anticipated to endanger public health or welfare.” See § 6(a) of the Clean Air Amendments of 1970, 84 Stat. 1690. Congress amended § 202(a)(1) in 1977 to give its approval to the decision in Ethyl Corp. v. EPA, 541 F. 2d 1, 25 (CADC 1976) (en banc), which held that the Clean Air Act “and common sense... demand regulatory action to prevent harm, even if the regulator is less than certain that harm is otherwise inevitable.” See § 401(d)(1) of the Clean Air Act Amendments of 1977, 91 Stat. 791; see also H. R. Rep. No. 95-294, p. 49 (1977).

 The Council on Environmental Quality had issued a report in 1970 concluding that “[m]an may be changing his weather.” Environmental Quality: The First Annual Report 93. Considerable uncertainty remained in those early years, and the issue went largely unmentioned in the congressional debate over the enactment of the Clean Air Act. But see 116 Cong. Rec. 32914 (1970) (statement of Sen. Boggs referring to Council’s conclusion that “[a]ir pollution alters the climate and may produce global changes in temperature”).

 See Intergovernmental Panel on Climate Change, Climate Change 2001: Synthesis Report, pp. 202-203 (2001). By drilling through thick Antarctic ice sheets and extracting “cores,” scientists can examine ice from long ago and extract small samples of ancient air. That air can then be analyzed, yielding estimates of carbon dioxide levels. Ibid.

 A more dramatic rise was yet to come: In 2006, carbon dioxide levels reached 382 parts per million, see Dept, of Commerce, National Oceanic & Atmospheric Administration, Mauna Loa C02 Monthly Mean Data, http:// www.esrl.noaa.gov/gmd/ccgg/trends/co2_mm_mlo.dat (all Internet materials as visited Mar. 29, 2007, and available in Clerk of Court’s case file), a level thought to exceed the concentration of carbon dioxide in the atmosphere at any point over the past 20 million years. See Intergovernmental Panel on Climate Change, Technical Summary of Working Group I Report 39 (2001).

 Climate Research Board, Carbon Dioxide and Climate: A Scientific Assessment, p. viii (1979).

 IPCC, Climate Change: The IPCC Scientific Assessment, p. xi (J. Houghton, G. Jenkins, & J. Ephraums eds. 1991).

 The industrialized countries listed in Annex I to the UNFCCC undertook to reduce their emissions of greenhouse gases to 1990 levels by the year 2000. No immediate restrictions were imposed on developing countries, including China and India. They could choose to become Annex I countries when sufficiently developed.

 IPCC, Climate Change 1995, The Science of Climate Change, p. 4.

 Alliance for Sustainable Communities; Applied Power Technologies, Inc.; Bio Fuels America; The California Solar Energy Industries Assn.; Clements Environmental Corp.; Environmental Advocates; Environmental and Energy Study Institute; Friends of the Earth; Full Circle Energy Project, Inc.; The Green Party of Rhode Island; Greenpeace USA; International Center for Technology Assessment; Network for Environmental and Economic Responsibility of the United Church of Christ; New Jersey Environmental Watch; New Mexico Solar Energy Assn.; Oregon Environmental Council; Public Citizen; Solar Energy Industries Assn.; The SUN DAY Campaign. See App. 7-11.

 See 42 U. S. C. § 7607(b)(1) (“A petition for review of action of the Administrator in promulgating any... standard under section 7521 of this title ... or final action taken, by the Administrator under this chapter may be filed only in the United States Court of Appeals for the District of Columbia”).

 The Chief Justice accuses the Court of misreading Georgia v. Tennessee Copper Co., 206 U. S. 230 (1907), see post, at 537-538 (dissenting opinion), and “devis[ing] a new doctrine of state standing,” post, at 548. But no less an authority than Hart & Wechsler’s The Federal Courts and the Federal System understands Tennessee Copper as a standing decision. R. Fallon, D. Meltzer, & D. Shapiro, Hart & Wechsler’s The Federal Courts and the Federal System 290 (5th ed. 2003). Indeed, it devotes an entire section to chronicling the long development of cases permitting States “to litigate as parens patriae to .protect quasi-sovereign interests — i. e., public or governmental interests that concern the state as a whole.” Id., at 289; see, e. g., Missouri v. Illinois, 180 U. S. 208,240-241 (1901) (finding federal jurisdiction appropriate not only “in cases involving boundaries and jurisdiction over lands and their inhabitants, and in cases directly affecting the property rights and interests of a State,” but also when the “substantial impairment of the health and prosperity of the towns and cities of the state” are at stake).
Drawing on Massachusetts v. Mellon, 262 U. S. 447 (1923), and Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez, 458 U. S. 592 (1982) (citing Missouri v. Illinois, 180 U. S. 208 (1901)), The Chief Justice claims that we “overloo[k] the fact that our cases cast significant doubt on a State’s standing to assert a quasi-sovereign interest . . . against the Federal Government.” Post, at 539. Not so. Mellon itself disavowed any such broad reading when it noted that the Court had been “called upon to adjudicate, not rights of person or property, not rights of dominion over physical domain, [and] not quasi-sovereign rights actually invaded or threatened." 262 U. S., at 484-485 (emphasis added). In any event, we held in Georgia v. Pennsylvania R. Co., 324 U. S. 439, 447 (1945), that there is a critical difference between allowing a State “to protect her citizens from the operation of federal statutes” (which is what Mellon prohibits) and allowing a State to assert its rights under federal law (which it has standing to do). Massachusetts does not here dispute that the Clean Air Act applies to its citizens; it rather seeks to assert its rights under the Act. See also Nebraska v. Wyoming, 515 U. S. 1, 20 (1995) (holding that Wyoming had standing to bring a cross-claim against the United States to vindicate its “ ‘quasi-sovereign’ interests which are ‘independent *521 of and behind the titles of its citizens, in all the earth and air within its domain’ ” (quoting Tennessee Copper, 206 U. S., at 237)).

 In this regard, MacCracken’s 2004 affidavit — drafted more than a year in advance of Hurricane Katrina — was eerily prescient. Immediately after discussing the “particular concern” that climate change might cause an “increase in the wind speed and peak rate of precipitation of major tropical cyclones (i. e., hurricanes and typhoons),” MacCracken noted that “Hail compaction, sea level rise and recurrent storms are destroying approximately 20-30 square miles of Louisiana wetlands each year. These wetlands serve as a ‘shock absorber’ for storm surges that could inundate New Orleans, significantly enhancing the risk to a major urban population.” ¶¶ 24-25, Stdg. App. 217.

 “For example, the [Massachusetts Department of Conservation and Recreation] owns, operates and maintains approximately 53 coastal state parks, beaches, reservations, and wildlife sanctuaries. [It] also owns, operates and maintains sporting and recreational facilities in coastal areas, including numerous pools, skating rinks, playgrounds, playing fields, former coastal fortifications, public stages, museums, bike trails, tennis courts, boathouses and boat ramps and landings. Associated with these coastal properties and facilities is a significant amount of infrastructure, which the Commonwealth also owns, operates and maintains, including roads, parkways, stormwater pump stations, pier[s], sea wal[l] revetments and dams.” Hoogeboom Deck ¶ 4, at 171.

 See also id., at 179 (declaration of Christian Jacqz) (discussing possible loss of roughly 14 acres of land per miles of coastline by 2100); Kirshen Decl. ¶ 10, at 198 (alleging that “[w]hen such a rise in sea level occurs, a 10-year flood will have the magnitude of the present 100-year flood and a 100-year flood will have the magnitude of the present 500-year flood”).

 In dissent, The Chief Justice dismisses petitioners’ submissions as “conelusory,” presumably because they do not quantify Massachusetts’ land loss with the exactitude he would prefer. Post, at 542. He therefore asserts that the Commonwealth’s injury is “conjectur[al].” See ibid. Yet the likelihood that Massachusetts’ coastline will recede has nothing to do with whether petitioners have determined the precise metes and bounds of their soon-to-be-flooded land. Petitioners maintain that the seas are rising and will continue to rise, and have alleged that such a rise will lead to the loss of Massachusetts’ sovereign territory. No one, save perhaps the dissenters, disputes those allegations. Our cases require nothing more.

 See UNFCCC, National Greenhouse Gas Inventory Data for the Period 1990-2004 and Status of Reporting 14 (2006) (reflecting emissions from Annex I countries); UNFCCC, Sixth Compilation and Synthesis of Initial National Communications from Parties not Included in Annex I to the Convention 7-8 (2005) (reflecting emissions from non-Annex I countries); see also Dept, of Energy, Energy Information Admin., International Energy Annual 2004, H.lco2 World Carbon Dioxide Emissions from the Consumption and Flaring of Fossil Fuels, 1980-2004 (Table), http:// www.eia.doe.gov/pub/international/iealf/tablehlco2.xls.

 See also Mountain States Legal Foundation v. Gliekman, 92 F. 3d 1228, 1234 (CADC 1996) (“The more drastic the injury that government action makes more likely, the lesser the increment in probability to establish standing”); Village of Elk Grove Village v. Evans, 997 F. 2d 328, 329 (CA7 1993) (“[E]ven a small probability of injury is sufficient to create a case or controversy — to take a suit out of the category of the hypothetical — provided of course that the relief sought would, if granted, reduce the probability”).

 In his dissent, The Chief Justice expresses disagreement with the Court’s holding in United States v. Students Challenging Regulatory Agency Procedures (SCRAP), 412 U. S. 669,687-688 (1973). He does not, however, disavow this portion of Justice Stewart’s opinion for the Court: “Unlike the specific and geographically limited federal action of which the petitioner complained in Sierra Club [v. Morton, 405 U. S. 727 (1972)], the challenged agency action in this case is applicable to substantially all of the Nation’s railroads, and thus allegedly has an adverse environmental impact on all the natural resources of the country. Rather than a limited group of persons who used a picturesque valley in California, all persons who utilize the scenic resources of the country, and indeed all who breathe its air, could claim harm similar to that alleged by the environmental groups here. But we have already made it clear that standing is not to be denied simply because many people suffer the same injury. Indeed some of the cases on which we relied in Sierra Club demonstrated the patent fact that persons across the Nation could be adversely affected by *527 major governmental actions. To deny standing to persons who are in fact injured simply because many others are also injured, would mean that the most injurious and widespread Government actions could be questioned by nobody. We cannot accept that conclusion.” Ibid, (citations omitted and emphasis added).
It is moreover quite wrong to analogize the legal claim advanced by Massachusetts and the other public and private entities who challenge EPA’s parsimonious construction of the Clean Air Act to a mere “lawyer’s game.” See post, at 548.

 See Department of Housing and Urban Development v. Rucker, 535 U. S. 125, 131 (2002) (observing that “‘any’... has an expansive meaning, that is, one or some indiscriminately of whatever kind” (some internal quotation marks omitted)).

 In dissent,. Justice Scalia maintains that because greenhouse gases permeate the world’s atmosphere rather than a limited area near the earth’s surface, EPA’s exclusion of greenhouse gases from the category of air pollution “agentfe]” is entitled to deference under Chevron U. S. A. Inc. v. Natural Resources Defense Council, Inc., 467 U. S. 837 (1984). See post, at 558-560. EPA’s distinction, however, finds no support in the text of the statute, which uses the phrase “the ambient air” without distinguishing between atmospheric layers. Moreover, it is a plainly unreasonable reading of a sweeping statutory provision designed to capture “any physical, chemical... substance or matter which is emitted into or otherwise enters the ambient air.” 42 U. S. C. § 7602(g). Justice Scalia does not (and cannot) explain why Congress would define “air pollutant” so carefully and so broadly, yet confer on EPA the authority to narrow that definition whenever expedient by asserting that a particular substance is not an “agent.” At any rate, no party to this dispute contests that greenhouse gases both “ente[r] the ambient air” and tend to warm the atmosphere. They are therefore unquestionably “agent[s]” of air pollution.

 See United States v. Price, 361 U. S. 304, 313 (1960) (holding that “the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one”); see also Cobell v. Norton, 428 F. 3d 1070, 1075 (CADC 2005) (“[P]ost-enactment legislative history is not only oxymoronic but inherently entitled to little weight”).

 See, e. g., National Climate Program Act, §5, 92 Stat. 601, 15 U. S. C. §2901 et seq. (calling for the establishment of a National Climate Program and for additional climate-change research); Global Climate Protection Act of 1987, § 1103, 101 Stat. 1408-1409, note following 15 U. S. C. §2901 (directing EPA and the Secretary of State to “jointly” develop a “coordinated national policy on global climate change” and report to Congress); Global Change Research Act of 1990, Tit. I, 104 Stat. 3097, 15 U. S. C. §§2921-2938 (establishing for the “development and coordination of a comprehensive and integrated United States research program” to aid in “understand[ing] . . . human-induced and natural processes of climate change”); Global Climate Change Prevention Act of 1990, 104 Stat. 4058, 7 U. S. C. §6701 et seq. (directing the Dept, of Agriculture to study the effects of climate change on forestry and agriculture); Energy Policy Act of 1992, §§ 1601-1609, 106 Stat. 2999,42 U. S. C. §§ 13381-13388 (requiring the Secretary of Energy to report on information pertaining to climate change).

 We are moreover puzzled by EPA’s roundabout argument that because later Congresses chose to address stratospheric ozone pollution in a specific legislative provision, it somehow follows that greenhouse gases cannot be air pollutants within the meaning of the Clean Air Act.