The Honorable STEPHEN V. WILSON, U.S. DISTRICT JUDGE
I. INTRODUCTION
Before the Court are the parties' cross-motions for summary judgment on Plaintiffs' claims against the U.S. Environmental Protection Agency ("EPA"). Dkts. 50, 52. For the reasons stated below, the Court GRANTS Plaintiffs' motion for summary judgment and DENIES Defendants' motion for summary judgment.
II. FACTUAL AND PROCEDURAL BACKGROUND[1]
A. The Problem of Pollution from Stormwater Runoff in Los Angeles
When rain falls on undeveloped land, water is absorbed by vegetation, soaked up *1118 by the ground, and filtered by both. On the other hand, when rain falls on impervious surfaces like concrete and asphalt, water cannot reach the soil and vegetation that slow and filter its flow. Instead, it becomes runoff. The impervious surfaces that increase runoff are often concentrated in urban areas. High population density and activity in these areas generate elevated levels of pollutants that collect on roadways, parking lots, roofs, and other impervious surfaces. When rain falls on these surfaces, it mobilizes pollutants that have accumulated there. These pollutants travel with the runoff as it flows into storm sewer systems and waterways. This urban stormwater pollution is a leading cause of water pollution in the Los Angeles area.
The Dominguez Channel is a Los Angeles waterway that begins as an underground storm drain and continues as an open channel before flowing into the Los Angeles Inner Harbor. One million people live in the Dominguez Channel watershed, including many who use the Channel and the Harbor for recreation. The Harbor provides habitat for hundreds of species, including birds, sea lions, dolphins, and fish.
The Los Cerritos Channel begins as a concrete-lined channel before becoming a tidal estuary. It drains into the Alamitos Bay, and from there into the Pacific Ocean. A path runs along part of the Channel. The Channel is home to a marina and a popular fishing spot. The watershed provides an overwintering site for many species of birds.
The Dominguez and Los Cerritos Channel watersheds are both heavily polluted by stormwater runoff. In particular, the water quality of the Dominguez Channel watershed is impaired by a variety of pollutants, including zinc and copper. The freshwater portion of the Los Cerritos Channel is similarly impaired by zinc and copper pollution. The water quality of both watersheds is expected to remain impaired by pollution, especially zinc and copper pollution, for years to come. Metals like zinc and copper have acute and chronic impacts on aquatic life. The pollution also makes these waterways unsafe and unenjoyable for people who live, work, and play nearby. Compl. ¶¶ 37-38, 42-54.
B. The Clean Water Act's Regulation of Pollution from Stormwater
In 1972, Congress passed a series of sweeping amendments to the Federal Water Pollution Control Act of 1948, and as a result of these substantial amendments, the statute became known as the Clean Water Act. Nw. Envtl. Advocates v. U.S. E.P.A. , 537 F.3d 1006, 1010 (9th Cir. 2008). The Clean Water Act set forth a "national goal that the discharge of pollutants into the navigable waters be eliminated by 1985." 33 U.S.C. § 1251(a).
The Clean Water Act established a blanket prohibition on "the discharge of any pollutant by any person" from a point source not subject to an exception. Id. § 1311(a). One such exception is for discharges of pollutants authorized by a permit granted pursuant to the National Pollutant Discharge Elimination System ("NPDES").[2] Id. The scheme for NPDES
*1119 permitting is set forth in another section of the Act. Id. § 1342. Due to EPA's slow pace in regulating stormwater discharges in particular, in 1987, Congress amended the section governing NPDES permits to expressly require EPA to issue NPDES permits to regulate these discharges. 33 U.S.C. § 1342(p) ; 132 Cong. Rec. S16425 (daily ed. Oct. 16, 1986) (statement of Sen. Stafford) ("EPA should have developed this program long ago. Unfortunately, it did not."). Thus, stormwater discharges that travel through storm sewers are point source discharges subject to NPDES permitting requirements. Envtl. Def. Ctr., Inc. v. U.S. E.P.A. , 344 F.3d 832, 841 (9th Cir. 2003). The amendments placed a temporary moratorium (expiring in 1994) exempting some, but not all, stormwater discharges from the requirement to obtain permits. 33 U.S.C. § 1342(p)(1)-(2) ; Envtl. Def. Ctr., Inc. , 344 F.3d at 842. Congress limited this exemption by carving out five categories of stormwater discharges, including "[a] discharge for which the Administrator or the State, as the case may be, determines that the stormwater discharge contributes to a violation of a water quality standard or is a significant contributor of pollutants to waters of the United States." 33 U.S.C. § 1342(p)(2). In other words, stormwater discharges that fall within one of the five exceptions set forth in the statute are not subject to the exemption and were to be regulated immediately.
EPA oversees NPDES permitting. 33 U.S.C. § 1251(d). The agency may issue permits authorizing point source discharges of pollutants, subject to appropriate conditions, id. § 1342(a)(1), or may delegate to states the authority to implement the permitting program., id. § 1342(b). In California, EPA has authorized the State Water Resources Control Board to implement the NPDES permitting program.
California has taken steps to control impacts from stormwater discharges. Principal among these efforts are California's municipal separate storm sewer systems ("MS4s")[3] permits throughout the Los Angeles area, where more than 85 municipalities are covered. The MS4 permits regulate the discharge of stormwater into the receiving waters that Plaintiffs seek to protect, contain limitations that prohibit discharges that cause or contribute to violations of water quality standards, and use water quality driven planning.
C. Plaintiffs' Administrative Petitions and the Present Lawsuit
EPA's stormwater regulations provide that any person may petition the agency "to require a National Pollutant Discharge Elimination System ('NPDES') permit for a discharge which is composed entirely of storm water which contributes to a violation of a water quality standard." 40 C.F.R. § 122.26(f)(2). Pursuant to that regulation, Plaintiffs submitted two petitions to EPA Region 9, which oversees Clean Water Act compliance in California. The petitions involved two different Los Angeles-area watersheds: (1) the Dominguez *1120 Channel and Los Angeles/Long Beach Inner Harbor watershed, and (2) the Los Cerritos Channel and Alamitos Bay watershed (collectively, "the watersheds"). Cirino Decl., Ex. A at 1 (Dominguez Pet.), Ex. B at 1 (Los Cerritos Pet.), Dkt. No. 39-2. Plaintiffs' petitions requested that EPA make a determination that currently unpermitted stormwater discharges from privately-owned commercial, industrial, and institutional ("CII") sources are contributing to violations of water quality standards in the watersheds, and therefore require NPDES permits pursuant to 33 U.S.C. § 1342(p). Id . The petitions provided evidence that stormwater discharges from commercial, industrial, and institutional sources are impairing water quality in both watersheds. Dominguez Pet. at 12-23; Los Cerritos Pet. at 12-24.
On October 17, 2016, EPA denied Plaintiffs' petitions to require NPDES permits. Dkt. 39-2. ("Dominguez Pet. Denial" and "Los Cerritos Pet. Denial" collectively "Pet. Denials"). EPA concluded that stormwater discharges from CII sources were "contributing to water quality impairments" at the watersheds. Dominguez Pet. Denial at 16; Los Cerritos Pet. Denial at 17. Nevertheless, EPA concluded that requiring permits was unnecessary.
EPA analyzed Plaintiffs' petitions in light of the following factors: (1) the likelihood of exposure of pollutants to precipitation at sites identified in Plaintiffs' petitions; (2) the sufficiency of the available data on which to make a determination that stormwater discharges from those sites contribute to a violation of water quality standards; and (3) whether other federal, state, or local programs adequately address the known stormwater discharge contribution to a violation of water quality standards. Cirino Decl. Exhibit C at 5-16, Exhibit D at 5-17.
EPA concluded that the first two factors were satisfied. Specifically, EPA stated that "the pollutants of concern are exposed to stormwater at CII sources and that there are sufficient data available to demonstrate that stormwater discharges are contributing to water quality impairments in the [Watersheds]." Dkt. 39 at 7. With respect to the third factor, EPA concluded that existing programs are underway to adequately address the impairments. This conclusion primarily relied on NPDES permits that have been issued to MS4s in the watersheds, operated or controlled by municipalities. The EPA also cited to three other permits to show that adequate programs exist: a statewide NPDES permit for the California Department of Transportation, a statewide general permit for industrial facilities, and a statewide permit for small MS4s. None of these permits regulate the CII sources in the watersheds which were the subject of Plaintiffs' petitions, leaving these stormwater discharges unregulated. Because of the existing NPDES permits, EPA refused to require the permits Plaintiffs' petitions requested and it denied the petitions.
Plaintiffs subsequently sent EPA notice of their intent to sue the agency for its failure to regulate the sites. On May 8, 2017, Plaintiffs filed a complaint in this Court, alleging (1) a failure to perform a nondiscretionary duty under the Clean Water Act pursuant to the Clean Water Act's citizen-suit provision, 33 U.S.C. § 1365(a)(2) ; and (2) in the alternative, arbitrary and capricious agency action in violation of the Administrative Procedure Act (APA), 5 U.S.C. § 706(2). Compl. ¶¶ 83-91.
On November 2, 2017, this Court granted in part and denied in part EPA's motion to dismiss Plaintiffs' claims. Dkt. 46. The Court dismissed Plaintiffs' claim under the Clean Water Act's citizen-suit provision. Id. The Clean Water Act's citizen-suit provisi *1121 on, 33 U.S.C. § 1365(a)(2), provides a limited waiver of sovereign immunity for citizen suits alleging EPA's failure "to perform any act or duty under this chapter which is not discretionary." If EPA has failed to perform a nondiscretionary duty, "[t]he district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties ... to order the Administrator to perform such act or duty[.]" Id. § 1365(a). In its order, this Court concluded that EPA had discretion to decide whether or not to require NPDES permits for stormwater. Because the citizen-suit provision only provides for such suits where a plaintiff seeks to enforce a non discretionary duty, the Court dismissed Plaintiffs' citizen-suit claim. The Court allowed Plaintiffs' claim under the APA to proceed, however.
III. LEGAL STANDARD
Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). When reviewing final agency action, however, "there are no disputed facts that the district court must resolve." Occidental Eng'g Co. v. INS , 753 F.2d 766, 769 (9th Cir. 1985). Instead, "the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." Id. Thus, the Court decides whether the agency's action passes muster under the appropriate standard of review. Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agr. , 499 F.3d 1108, 1115 (9th Cir. 2007).
Because the Clean Water Act does not provide a separate standard for review of EPA decision-making, judicial review of final agency action by EPA is governed by the standard set out in the APA. 5 U.S.C. §§ 701 - 06. The APA requires a court to "hold unlawful and set aside agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Compassion Over Killing v. FDA , 849 F.3d 849, 854 (9th Cir. 2017) (quoting 5 U.S.C. § 706(2) ). An agency decision is arbitrary and capricious if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co. , 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).
IV. DISCUSSION
Before the Court is Plaintiffs' claim against EPA under the APA. Plaintiffs argue that EPA's denial of its petitions was arbitrary and capricious for two reasons: (1) the text of the Clean Water Act requires EPA to engage in the NPDES permitting process for the stormwater it has determined contributes to a water quality violation and (2) in denying Plaintiffs' petition, EPA considered an improper factor in its denial. The Court also evaluates Plaintiff American Rivers' standing, as a result of EPA's contention that American Rivers lacks standing.
As explained below, the Court concludes that EPA acted arbitrarily and capriciously in denying Plaintiffs' permits and leaving the stormwater discharges at issue unregulated. First, where, as here, EPA has determined that a stormwater discharge contributes to a violation of a water quality standard, the Clean Water Act requires *1122 EPA to either (1) engage in the NPDES permitting process for the discharge at issue or (2) prohibit the discharge. An additional basis for concluding that EPA's denial of Plaintiffs' petition was arbitrary and capricious is that EPA considered a factor divorced from the text of the statute.
A. The Text of the Clean Water Act Requires EPA to Engage in the Permitting Process
Within the structure of the Clean Water Act as a whole, 33 U.S.C. § 1342 describes the bounds of a limited exception to the Act's broad prohibition of the discharge of pollutants into the waters of the United States. 33 U.S.C. §§ 1311(a), 1342(a). Indeed, § 1311 establishes the general rule that the discharge of pollutants is prohibited, unless an exception applies, and § 1342 is one of the listed exceptions. Id. § 1311(a). Section 1342(a) states that "the Administrator may ... issue a permit for the discharge of any pollutant, or combination of pollutants, notwithstanding section 1311(a) of this title" under certain conditions. Id. § 1342(a). The use of the term may in § 1342(a) indicates that the Administrator can choose to issue a permit or decline to do so, based on the conditions in the statute.[4] When read in conjunction with § 1311(a), however, § 1342(a) does not mean that if the Administrator declines to issue permits for the discharge of pollutants, he may leave pollutants subject to the requirements of the statute unregulated . Rather, the statute means that the Administrator may either (1) issue a permit for the discharge of the pollutant or (2) enforce the total proscription on discharge set forth in § 1311(a).[5] Nw. Envtl. Advocates , 537 F.3d at 1022 (" 'The use of the word 'may' in [ § 1342 ] means only that the Administrator has discretion either to issue a permit or to leave the discharger subject to the total proscription of [ § 1311 ].' " (quoting Nat. Res. Def. Council, Inc. v. Costle , 568 F.2d 1369, 1375 (D.C. Cir. 1977) ) ). EPA "does not have authority to exempt categories of point sources from the permit requirements [of § 1342 ]." Id. (internal quotations omitted).
Section 1342(p) sets forth the structure for NPDES permits for stormwater discharge. This section sets forth a general rule followed by a list of exceptions. The general rule is that prior to 1994, stormwater discharges are exempt from NPDES permitting requirements. 33 U.S.C. § 1342(p)(1). In other words, the general rule temporarily excludes stormwater from the either (1) being subject to a NPDES permit or (2) being subject to the total proscription against discharge set forth in § 1311(a). In essence, the general rule temporarily allows stormwater discharge to go unregulated .
In § 1342(p)(2), the statute sets forth five exceptions to the moratorium on the *1123 regulation of stormwater discharges established in § 1342(p)(1). If a category of stormwater falls within one of the five exceptions, then it is not subject to the moratorium on regulating stormwater and is placed back within the broader rule of the statute that all discharges of pollutants must be either subject to (1) a NPDES permit or (2) totally proscribed. It is undisputed that the stormwater discharges from the CII sources of which Plaintiffs' petition sought regulation fall within the exception in § 1342(p)(2)(E) : "[a] discharge for which the Administrator ... determines that the stormwater discharge contributes to a violation of a water quality standard or is a significant contributor of pollutants to waters of the United States." Because the discharges at issue fall within the exception to the moratorium on regulating stormwater, EPA must either (1) engage in the permitting process for the stormwater discharge[6] or (2) leave them subject to § 1311(a)'s "total proscription" on discharge.
Accordingly, once EPA determined "there are sufficient data available to demonstrate that stormwater discharges are contributing to water quality impairments in the [Watersheds]," Dkt. 39 at 7, the statute required EPA to engage in the permitting process or prohibit the discharge. 33 U.S.C. §§ 1311(a) ; 1342(p)(1)-(2). But EPA left the stormwater discharges at issue unregulated in violation of the text of the Clean Water Act. Declining to engage in the permitting process for the stormwater discharges at issue was therefore arbitrary and capricious because it was contrary to law.
EPA's interpretation is not entitled to deference.[7] Deference to administrative agencies under Chevron, U.S.A., Inc. v. Nat. Res. Def. Council , 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), is appropriate only if the statute is ambiguous or silent on the question at issue. 467 U.S. at 842-44, 104 S.Ct. 2778. The statute at issue here unambiguously requires EPA to engage in the permitting process where it has determined that stormwater discharges contribute to a water quality violation. 33 U.S.C. § 1342(p)(2)(E) ; see also Nw. Envtl. Advocates , 537 F.3d at 1022. Where "the intent of Congress is clear," as it is here, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Wilderness Soc'y v. U.S. Fish & Wildlife Serv. , 353 F.3d 1051, 1059 (9th Cir. 2003) (en banc) (quoting Chevron , 467 U.S. at 842-43, 104 S.Ct. 2778 ).
B. EPA Considered an Improper Factor in Rejecting Plaintiffs' Petitions
An additional basis for finding that EPA's denial of Plaintiffs' petitions *1124 was arbitrary and capricious was that EPA considered an improper factor in deciding to deny the petitions.
The Supreme Court's analysis in Massachusetts v. EPA is instructive here. 549 U.S. 497, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007). In that case, plaintiffs sued EPA, claiming its decision declining to regulate greenhouse gases under the Clean Air Act was arbitrary and capricious. Massachusetts , 549 U.S. at 528, 127 S.Ct. 1438. In explaining its decision declining to regulate greenhouse gases, EPA explained that, even if greenhouse gases constituted an "air pollutant," rendering them subject to regulation under the Clean Air Act, EPA would decline to regulate because such regulation would conflict with other administration priorities. Id. The Supreme Court concluded that EPA's grounds for declining to regulate were arbitrary and capricious because they "rest[ed] on reasoning divorced from the statutory text" of the Clean Air Act. Id. at 532, 127 S.Ct. 1438.
The administration priorities EPA cited in declining to regulate greenhouse gases included the existence of voluntary executive branch programs that "already provide an effective response to the threat of global warming," foreign policy concerns, and that regulations curtailing motor vehicle emissions "would reflect an inefficient, piecemeal approach to address the climate change issue." Id. at 533, 127 S.Ct. 1438. According to the Supreme Court, EPA's reliance on these factors was impermissible. The Court found that EPA "has refused to comply with [a] clear statutory command." Id. "Under the clear terms of the Clean Air Act, EPA can avoid taking further action only if it determines that greenhouse gases do not contribute to climate change or if it provides some reasonable explanation as to why it cannot or will not exercise its discretion to determine whether they do." Id.
The provisions of the Clean Water Act relevant to this case are structured similarly to the Clean Air Act provision at issue in Massachusetts v. EPA . Both statutes set out specific criteria that trigger regulation. The section of the Clean Air Act that the Supreme Court interpreted in Massachusetts v. EPA reads, in relevant part, "The Administrator shall by regulation prescribe ... standards applicable to the emission of any air pollutant from any class or classes of new motor vehicles or new motor vehicle engines, which in his judgment cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare." 42 U.S.C. § 7521(a). The Supreme Court interpreted this language to mean that if EPA were to decline to regulate emissions of air pollutants, its explanation must be grounded in whether the air pollutants "cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare."[8] Massachusetts , 549 U.S. at 532-34, 127 S.Ct. 1438.
The Clean Water Act provisions at issue here provide that EPA must engage in the permitting process for stormwater discharges that contribute to water quality violations. If the EPA were to decline to *1125 engage in the permitting process, it must ground that decision in the text of the statute. Id. In other words, EPA's reasons for declining to issue permits must relate to whether the stormwater at issue contributes to a violation of a water quality standard. 33 U.S.C. § 1342(p)(2)(E). One of the factors EPA used in declining Plaintiffs' petitions would be permissible because it is grounded in the text of the Clean Water Act. This factor was the sufficiency of the available data on which to make a determination that stormwater discharges from the sites at issue contribute to a violation of water quality standards. Cirino Decl. Exhibit C at 5-16, Exhibit D at 5-17. EPA could decline to regulate if it determined that it had insufficient data to make a conclusive determination that the stormwater discharges at issue contributed to water quality violations. Another permissible factor might be a finding by EPA that the contribution of the stormwater discharge at issue to water quality violations was only de minimis . Both of these factors would be permissible because they keep EPA's focus squarely on the criterion Congress set out in the text of the statute: whether the stormwater discharges contribute to a violation of water quality standards. 33 U.S.C. § 1342(p)(2)(E).
EPA does not point the Court to a provision of the Clean Water Act that indicates that EPA may consider whether other federal, state, or local programs adequately address the known stormwater discharge contribution to a violation of water quality standards. Therefore, EPA acted arbitrarily and capriciously in denying Plaintiffs' petition by considering a factor "divorced from the statutory text" in its denial." See Massachusetts , 549 U.S. at 532, 127 S.Ct. 1438.
C. Standing of Plaintiff American Rivers
EPA contends that Plaintiff American Rivers lacks standing to assert the claims at issue. Dkt. 52 at 25. EPA points out that the only evidence that American Rivers submitted that would support its standing was the declaration of a Washington-based Senior Director, who asserted that 37 members reside in the relevant watershed. Dkt. 50, Belan Decl. To establish standing, a plaintiff must demonstrate "(1) a concrete and particularized injury that is 'actual or imminent, not conjectural or hypothetical;' (2) a causal connection between the injury and the defendant's challenged conduct; and (3) a likelihood that a favorable decision will redress that injury." Pyramid Lake Paiute Tribe of Indians v. Nev. Dep't of Wildlife , 724 F.3d 1181, 1187 (9th Cir. 2013) (citing Lujan v. Defs. of Wildlife , 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) ). EPA argues that American Rivers failed to establish the requisite causal connection between the injury and the challenged agency decisions because it has not submitted evidence that the 37 members who live in the watershed came into contact with the waterways at issue. Dkt. 50 at 25.
In their reply brief, Plaintiffs do not dispute EPA's argument with respect to American Rivers' standing. Plaintiffs argue, however, that the Court need not reach the question of American Rivers' standing. EPA does not contest the standing of the other plaintiffs in this case, Los Angeles Waterkeeper and National Resources Defense Council. Plaintiffs point to a Ninth Circuit case in which the court stated, "[t]he general rule applicable to federal court suits with multiple plaintiffs is that once the court determines that one of the plaintiffs has standing, it need not decide the standing of the others." Leonard v. Clark , 12 F.3d 885, 888 (9th Cir. 1993). This case does not control the outcome here, however. In Leonard , the district *1126 court had already decided that one of the plaintiffs had standing. Id. By contrast, the Court has not ruled on the standing of any of the Plaintiffs. The standing of Los Angeles Waterkeeper and National Resources Defense Council is merely undisputed.
Accordingly, the Court concludes that American Rivers lacks standing and dismisses it from this case. The other two Plaintiffs' standing is undisputed; therefore, the Court retains jurisdiction over Plaintiffs' claims.
V. CONCLUSION
For the foregoing reasons, the Court GRANTS Plaintiffs' motion for summary judgment and DENIES Defendants' motion for summary judgment. EPA's denial of Plaintiff's petitions and failure to engage in the NPDES permitting process was arbitrary and capricious. EPA must either (1) engage in the NPDES permitting process for stormwater discharges from the CII sources in Plaintiffs' petitions that EPA has determined contribute to a violation of water quality standards or (2) enforce the Clean Water Act's total proscription on the discharge of such pollutants.
IT IS SO ORDERED.

Unless otherwise indicated, all facts are taken from the parties' statements of uncontroverted facts. Dkts. 50, 52.

An NPDES permit contains limits on what a person or facility can discharge, monitoring and reporting requirements, and other provisions to ensure that the discharge does not hurt water quality or people's health. https://www.epa.gov/npdes/npdes-permit-basics. In essence, the permit translates general requirements of the Clean Water Act into specific provisions tailored to the operations of each person or facility discharging pollutants. Id.

An MS4 is a conveyance or system of conveyances that is owned by a state, city, town, village, or other public entity that is designed or used to collect or convey stormwater, such as storm drains, pipes, and ditches. 40 C.F.R. § 122.26(b)(8). Polluted stormwater runoff is commonly transported through MS4s, and then often discharged, untreated, into local water bodies. To control the discharge of pollutants in stormwater, operators of certain MS4s must obtain NPDES permits and develop stormwater management programs. The stormwater management programs describe the stormwater control practices that will be implemented consistent with permit requirements to minimize the discharge of pollutants from the sewer system. See https://www.epa.gov/npdes/stormwater-discharges-municipal-sources (accessed February 16, 2018).

This reading is consistent with the Court's conclusion in its November 2, 2017 order that EPA had discretion to decide whether to require permits. Where EPA determines that stormwater discharges contribute to a violation of water quality standards, 33 U.S.C. § 1342(p)(2)(E), it has discretion to either (1) require NPDES permits for the discharges or (2) enforce § 1311(a)'s total proscription of discharge of pollutants.

The Ninth Circuit concluded that the "statutory language is unambiguous" on this point. Nw. Envtl. Advocates , 537 F.3d at 1022. Nonetheless, the Ninth Circuit noted that the D.C. Circuit had reviewed the Clean Water Act's legislative history and confirmed that "the legislative history makes clear that Congress intended the NPDES permit to be the only means by which a discharger from a point source may escape the total prohibition of [§ 1311(a) ]." Id. (citing Costle , 568 F.2d at 1374 ).

As the Ninth Circuit has stated, "[o]btaining a permit under the [Clean Water Act] need not be an onerous process. For example, in appropriate circumstances a discharge may be allowed under a 'general permit' requiring only that the discharger submit a 'notice of intent' to make the discharge." Nw. Envtl. Advocates , 537 F.3d at 1010.

EPA interprets 33 U.S.C. § 1342(p)(2)(E) as authorizing, but not requiring EPA to require permits for discharges that contribute to violations of water quality standards. Dkt. 39 at 13. EPA's first interpretive step is correct. But EPA implies that if the Administrator declines to require permits for such discharges, then EPA may leave those discharges unregulated. Id. This second interpretive step is incorrect. As explained, the text of the statute indicates that EPA must either require permits or leave the discharges subject to § 1311(a)'s total proscription on the discharges. EPA "does not have authority to exempt categories of point sources from the permit requirements [of § 1342 ]." Nw. Envtl. Advocates , 537 F.3d at 1022 (internal quotations omitted).

EPA argues that the § 1342(p)(2)(E) does not set forth any "factors" that EPA may or must consider when deciding whether to issue NPDES permits for stormwater discharges. Rather, in EPA's view, § 1342(p)(2)(E) sets forth a prerequisite that must exist-stormwater discharge contributing to a violation of water quality standards-before EPA may exercise its discretion to issue permits. The Clean Air Act set up a similar statutory structure: criterion that triggers regulation. In Massachusetts v. EPA , the Supreme Court concluded that any decision by EPA not to regulate under such a structure must be based on reasons grounded in the text of the statute. Similarly here, EPA's decision not to regulate was impermissible because it was based on a factor divorced from the statutory text.